# CASES

# SECOND DISTRICT

# APPELLATE COURT OF ILLINOIS

## DURING THE YEAR 1905.

---

## Court of Honor v. Carolina Dinger.

### Gen. No. 4,507.

1. FRATERNAL BENEFIT CERTIFICATE—*what waives ground for forfeiture of.* Where a local lodge, which in law is the agent of the main organization, accepts an assessment with knowledge of the conditions, a ground for forfeiture is thereby deemed to have been waived.

2. FORFEITURE—*when will not be enforced.* Forfeitures are not favored at law and unless clearly established will not be enforced.

3. REINSTATEMENT—*when deemed valid.* A reinstatement obtained by a member of a fraternal benefit society at a time when he was suffering from an affliction which ultimately caused his death, is not invalid where at the time such member did not believe the affliction permanent.

4. REINSTATEMENT—*duty of member at time of.* Where a by-law of a fraternal benefit society provides that reinstatement may be had by a member if in good health by paying his arrearages, it is incumbent upon the society to ascertain the condition of the health of the member at such time, and in the absence of fraud his reinstatement is binding upon the society.

5. CONDITION OF HEALTH—*what competent in proof of.* In an action upon a benefit certificate it is competent for the society to prove statements made by the insured at or about the time of his reinstatement.

6. OFFER OF PROOF—*when insufficient.* An offer of proof which consists of the statement of the conclusions of counsel is insufficient; the precise evidence sought to be introduced should be substantially recited in the offer.

Action of assumpsit. Appeal from the Circuit Court of Lee County; the Hon. RICHARD S. FARRAND, Judge, presiding. Heard in this court at the April term, 1905. Affirmed. Opinion filed October 25, 1905.

William B. Risse and Henry S. Dixon, for appellant.

William H. Winn, for appellee.

Mr. Justice Farmer delivered the opinion of the court.

Carl A. Dinger held a benefit certificate payable to his wife as beneficiary, issued to him by appellant May 26, 1893. The eleventh assessment upon his certificate for the year 1902 was due on or before November 30th of that year. He did not pay it on or before that date and was suspended from membership in the society December 1, 1902. On the 23d of that month he paid to the recorder of the local lodge this assessment with assessment No. 12, and was thereupon reinstated. On the 24th of January, 1903, he died. Dr. Hunt, a physician, testified that the immediate cause of death was strangulation or choking from a spasm of the larynx; that he had pulmonary and laryngeal tuberculosis, but it was in its incipient stage and not the cause of death. Appellant refused to pay the beneficiary and denied liability on the ground that the deceased was not in good health when reinstated. The certificate upon which suit is brought provided that all assessments for the benefit fund should be paid within the time specified by the constitution, laws and rules of the order, and if not so paid, the certificate should be void until payment had been made and the member reinstated to membership in the order. The constitution provided that notice of an assessment and the time for its payment should be published in the official paper of the order, and mailing a copy of the paper to the post office address of the member should be sufficient notice of the assessment. The constitution further provided that a member who, after notice of the levying of a benefit assessment, failed to pay on or before the last day of the month in which it was due should be suspended, and during such suspension the certificate should be null and void. Section 89 of the constitution is as follows: "When a member has been suspended for non-payment of assessments, dues or fines, he may be reinstated, if in good health, and not engaged in any of the prohibitive occupations, by

payment of arrearages, including current assessment, within sixty days from date of suspension." Appellant's contention is that deceased was not in good health when he paid the assessment December 22, 1902, and was, therefore, not legally reinstated to membership and was not in good standing in the order when he died. The trial in the Circuit Court resulted in a verdict and judgment in favor of appellee for the amount named in the certificate with interest thereon, from which this appeal is prosecuted.

Deceased was a farmer, and appellant introduced as witnesses four of his neighbors. All of them testified he had some affection of the throat the summer and fall before his death, that it caused hoarseness and was worse at some times than others, and that at times he could only speak in a whisper. Three of them testify he did not appear strong and healthy, but that he did some farm work, how much they could not tell. Only one of them testified positively that he was unable to work at any time on account of his physical condition, except during the last two weeks of his life. Two weeks before his death he was out in a rain, sleet and snow storm, got thoroughly wet and took cold. Appellant also offered the testimony of two physicians. Dr. Murphy testified he treated Dinger at his office three or four times between December 28, 1900, and March following, that he had bronchitis and coughed a great deal, that Dinger said he had had it four or five weeks, resulting from a cold he caught cleaning out a barn. The doctor says he also had symptoms of emphysema, and that this condition continued during the time he treated him though it somewhat improved. He says such conditions may be permanent, or the patient may recover, but that a person in the condition deceased was in while he treated him could not be said to be in good health. The last time the doctor saw him was in August, 1902. The doctor says he never saw much of him; that he would meet him on the street and send him to have his prescriptions refilled; that the last time he saw deceased he was complaining of the same ailment he had previously complained of, and said he

was working on a straw stack, stacking straw from a threshing machine, and the dust caused a return of the trouble. He further testified that a person afflicted as deceased was would be better in summer and worse in the winter, and that such trouble is usually permanent. Dr. Hunt testified he first saw deceased at his office in July, 1902, and next in December of the same year; that he prescribed for him in July, and that he was very hoarse at that time; that he was led to believe this was due to a cold or inhaling dust; that he prescribed for him again December 5th, and the hoarseness was worse than in July. He prescribed for him again December 15th, and says the hoarseness lasted so long he suspected tuberculosis and made a microscopical examination of the sputum, but did not find tuberculosis. The doctor made a *post-mortem* examination after Dinger's death and says it disclosed laryngeal and pulmonary tuberculosis or consumption of the larynx and lungs. The condition of the larynx, he says, was what is termed chronic laryngitis, that the tuberculosis had not advanced to the softening stage, but was just beginning, and that the death resulted from strangulation or choking from a spasm of the larynx and not from tuberculosis; that so far as that disease was concerned, Dinger might have lived many years. The doctor says he remembers deceased coming to him in the midst of a drenching rain storm the last of December or early in January, and scolded him for it. He further testified that it was not probable a man suffering from chronic laryngitis on the 15th day of December could have recovered so as to be considered to be in good health on the 22nd of the same month, but that there was nothing in the general appearance of the man to indicate to one untrained in medicine what his trouble was. Appellee introduced in evidence as witnesses two neighbors of deceased, also the widow and an eighteen-year old son. One of the neighbors testified to seeing deceased working on the farm the summer and fall before his death at plowing and making hay, also that in the threshing season of that fall he exchanged work with Dinger in threshing, and

that he did a man's work; that he was so hoarse he spoke in a kind of a whisper; that he had some throat trouble which was sometimes better and sometimes worse, but was confined to his bed only a short time before his death, and that he did not notice any signs of sickness in deceased other than his hoarseness. The other neighbor testified he lived within a hundred rods of Dinger from the spring before his death, that he had trouble with his voice and had to whisper, but did not observe that he was otherwise physically weak. He says during the thresh- ing and shredding season preceding Dinger's death, he and Dinger exchanged work with neighbors and in that way came in contact with each other; that the last shredding they did together was about the last of No- vember, and that Dinger did his share of the work the same as other hands. The son testified he was not living at home during all the time of the fall and winter preced- ing his father's death, but was there a good portion of the time; that his father worked, did his chores, took care of twenty cows and four horses and hauled milk to the station several times, also did some shredding and mowed shredded material in the barn. He says the other children helped some about the work, but they were small and going to school; that his father's voice was in bad condition part of the time and seemed worse some times than others. The widow testified her husband cultivated and husked thirty- five acres of corn the season before his death himself, and made a full hand in harvesting fifty acres of hay, in which she assisted; also that he cut the timber, made the posts and hauled them to the farm and built seventy rods of fence around the pasture, and in November and December worked at shredding corn. She says part of the time he could not speak aloud and his hoarseness got worse when he got dust in his throat. She testified there was nothing the matter with him except hoarseness that she knew of, that she had no idea he was sick otherwise. He went to town on a rainy day two weeks before his death, got thoroughly wet and after that was confined to the house and a part of

the time to the bed. She had no apprehension of his being in a critical condition and says the night of his death when the children went to bed he was asleep, and that at eleven o'clock she went to or near his room, and hearing no sound, went in and placed her hand on his face and found he was dead. This is the substance of all the testimony as to the condition of Dinger's health before his death, as we gather it from a careful reading of the abstract. Under this evidence, the jury found specially on interrogatories submitted that Dinger was in reasonably good health December 22, 1902, that he did not die from pulmonary and laryngeal phthisis, that he was not affected by the disease of emphysema, but that he had what was known as chronic laryngitis. It is insisted that these special findings, or at least some of them, are inconsistent with the general verdict and that the court erred in not rendering judgment for appellant on the special findings, notwithstanding the general verdict, and that the general verdict is also contrary to the evidence. Under the instructions given by the court, the general verdict necessarily included a finding upon the question of the condition of Dinger's health December 22, 1902, and whether there was any concealment of it from appellant. It appears from the evidence that deceased did not personally pay the November and December dues to Mr. Berry, the recorder of the local lodge, December 22nd, but caused it to be paid by some one else. Mr. Berry, therefore, did not see deceased and had no knowledge from personal observation of what his condition was at that time, but it also further appears from the evidence that no inquiry was made as to the condition of Dinger's health at the time, but that the money was accepted without question and he reinstated on the books as a member in good standing. We are of opinion from the testimony that the affliction of Dinger at and prior to the time of his reinstatement was of such a character that it did not seriously affect his physical strength and was not thought by him and most of those who knew him best seriously to affect his general health. The throat trouble was, as he himself

expressed it to one of the physicians, thought to be the result of a cold or la grippe, contracted in cleaning out a barn. Dr. Hunt says it is what would be termed chronic laryngitis. While it is true, the doctor says he suspected, and a *post-mortem* disclosed tuberculosis in its incipient stage, that disease was not the cause of death, but according to the doctor's testimony he died from strangulation caused by a spasm of the inflamed larynx, and the inflamed condition of the larynx was what is known as laryngitis. While the evidence on the question as to whether the disease so affected the general health of Dinger as to impair his physical strength and ability to perform his ordinary labor of farmer so that he himself or those having the most intimate knowledge of him would consider or believe that he was not in good health in the ordinary acceptation of the term, is conflicting, we are unable to say that the weight of it shows he was so afflicted. That he was not in good health when reinstated was an affirmative defense and the burden of proof on that proposition was upon appellant. We are impressed that the weight of the testimony shows that so far as deceased himself and his family were concerned, they thought the throat trouble temporary and that it did not affect his general health. The weight of the evidence is against the contention that he also had emphysema. There is, therefore, no evidence tending to show that the deceased acted fraudulently in paying the delinquent assessment and procuring his reinstatement. The fact that he did not in person make this payment to the recorder cannot even be deemed a suspicious circumstance, because that officer of the lodge testified Mr. Dinger lived several miles from Amboy, the place of the lodge and where the recorder lived, and that he had not seen him since March, 1902, so that it is evident a number of assessments were paid by the deceased through other parties the same as this one was. We regard the law as well settled in this state that the local lodge at Amboy was the agent of appellant. We also regard the law as settled that if the local lodge had knowledge of the condition of Dinger's

Court of Honor v. Dinger.

health when he was reinstated, and with such knowledge accepted the delinquent and current assessment and reinstated him, it would be a waiver of the forfeiture. Conductor's Benefit Ass'n v. Tucker, 157 Ill. 194; Metropolitan Accident Ass'n v. Windover, 137 Ill. 417; Mueller v. U. S. etc. Ass'n, 51 Ill. App. 40; Modern Woodmen v. Anderson, 71 Ill. App. 351. Provisions of forfeiture in an insurance policy are for the benefit of the insurer and are easily waived. Dubuque Fire & Marine Ins. Co. v. Oster, 74 Ill. App. 139. Forfeitures are not favored in law and before they will be enforced by the courts, they must be clearly established. Conductor's Benefit Ass'n v. Tucker, *supra;* Flicek v. Order Foresters, 90 Ill. App. 344. The case here presented differs in some of its features from any of the reported cases cited in briefs of counsel. In this case the insured, at the time of his suspension and reinstatement, was afflicted with a disease of the throat known as chronic laryngitis, that resulted in his death within a month and two days after the reinstatement. The insured knew of the affliction, but the evidence shows that he did not know or believe that the disease impaired his general health or threatened life. Whatever the condition of Dinger's health may have been at the time he paid the back and current assessments and was reinstated, it does not appear from the evidence there was any unfavorable change in his condition for some two years before his death. Dr. Murphy first saw deceased in December, 1900, and between that time and March following, saw him three or four other times. He last saw him in August 1902. During all this time Dinger had some affection of the throat and at times coughed a good deal. Dr. Murphy does not testify to any unfavorable progress made by the disease, nor to any perceptible change in the appearance of deceased. On the contrary, he says his condition improved. Dr. Hunt first saw deceased in July, 1902. At that time he was hoarse, which the doctor attributed to a cold or inhaling dust. Saw him again about December 5th, and he was still hoarse. The doctor then treated him, he says, for laryngitis, which he says is an inflamed condi-

tion of the larynx. While the doctor says at this time he suspected tuberculosis, the only reason he gives for it is, that the hoarseness had continued so long. He says nothing of any effect produced by the disease upon the physical condition or appearance of Mr. Dinger. On the 15th of December, Doctor Hunt again treated him, and last saw him the last of December or first of January, when he came to town through the cold and storm. From the testimony it does not appear that the ailment of Mr. Dinger had made any perceptible impression on his physical strength and condition from the time Doctor Murphy saw him first in December, 1900, to the time of his exposure to the storm about two weeks before his death. We think it is fairly to be presumed from the fact of deceased's membership in a local lodge of appellant as a fraternal benefit association and his payment of monthly assessments and dues thereto, that the officers of the local lodge had knowledge of his physical condition so far as it was indicated from appearances. Apparently the officers of the lodge were entirely willing to reinstate the deceased and continue him as a member in good standing if his health appeared to be in no worse condition than it had been for the past two years. This is evidenced by the fact that upon payment of the assessment in arrears and the one for the current month, he was restored to membership without inquiry as to his condition of health. Acceptance of the money under such circumstances might well induce the insured to believe appellant waived its right to insist upon a forfeiture. Dwelling House Insurance Co. v. Dowdall, 189 Ill. 179; Dubuque Fire and Marine Ins. Co. v. Oster, *supra*, and cases there cited; Atlantic Ins. Co. v. Wright, 22 Ill. 462; Commercial Insurance Co. v. Ives, 56 Ill. 402. It is evident if he had lived until death resulted from the tubercular condition, he would have lived a considerable time, perhaps years longer than he did, and that appellant would have gone on indefinitely receiving his dues and assessments. According to the testimony of the physician who held the *post-mortem*, death did not result from any cause anticipated by the

doctors, but was very nearly an accident. Dr. Hunt testified the throat trouble was what physicians call chronic laryngitis. It is a matter of common knowledge and observation that many persons have this affection of the throat without impairment of the general health. Unless it is attended with complications or tubercular conditions, it is not regarded as a disease that will probably produce death, and while it may run many years, it will also often yield to treatment and the patient entirely recover. In Dinger's case, the evidence shows there was a tubercular condition of the larynx, but it further shows it was in the incipient stage, not discoverable by a microscopical examination of the sputum made in December before his death, and that the tubercular condition of the lungs and larynx did not cause the death. We are of opinion that so far as the physical strength, feeling and condition of Dinger are shown by the evidence, he might reasonably have believed himself in good health, notwithstanding his throat trouble and hoarseness at and before the date of his reinstatement, and that the probability or even possibility of death resulting from his known condition could hardly have been in his mind or contemplation as a reasonable man at the time of his reinstatement. Section 89 of appellant's constitution provided that a member who had been suspended for non-payment of an assessment, might, if in good health and not engaged in any of the prohibited occupations, be reinstated by the payment of arrearages, including current assessment, within sixty days from date of suspension. It will be observed that no certificate of good health from a physician or any one else is required in order to entitle the suspended member to reinstatement. He is entitled to be reinstated "if in good health." Who shall determine that question and how or when it shall be determined is not stated. The provision quoted is for the protection of the society, and it surely cannot be that the officers charged with the management of its affairs have no duty to perform in seeing that persons seeking reinstatement are entitled to it. The evidence here justifies the conclusion that Dinger

believed he was entitled to reinstatement and that in paying the delinquent and current assessment he was not seeking to deceive or take any advantage of appellant, but was doing that which he supposed in good faith was his right and duty to do, to cause his restoration to membership in the society in good standing. It would seem that some duty should devolve upon appellant in determining the eligibility of a delinquent member to reinstatement, and that it should not be permitted to accept arrearages, reinstate a suspended member and go on for an indefinite period of time accepting payments without the slightest inquiry or investigation of the condition of the insured at the time of the reinstatement, and then when his death occurs, refuse payment on the ground that the insured was not in good health when reinstated. That the local lodge was so acting in accepting payments appears from the fact that in addition to the payment of the assessments made December 22nd, the recorder accepted payment of the January assessment two days after the death of the insured, but in ignorance thereof.

We believe under the authorities in this state, and the evidence as disclosed by this record, appellant waived its right, if it ever had such right, to declare a forfeiture of the beneficiary certificate.

During the progress of the examination of August Boeller, a witness for appellant, the witness started to relate something deceased had said about his health at corn-planting time, the spring before his death. This was objected to and the objection sustained. Later on, while the witness was still on the stand, counsel for appellant inquired of the court if he correctly understood him to rule that it was not competent to prove what the deceased said about his health, to which the court replied, "That is the way I am ruling now, but if you have any authorities here, I would like to hear them on that branch." Counsel replied, "Well, along that line I offer to prove certain statements made by the deceased, showing that he was in a poor condition of health during the last few months of his life."

The offer was objected to, the objection sustained and the ruling excepted to by appellant and this ruling assigned as one of the errors.   We are of opinion statements made by the insured at or about the time of his reinstatement would have been competent.   Towns v. Towns, 191 Ill. 478; Van Frank v. U. S. Benefit Association, 158 Ill. 560; Treat v. Merchant's Life Association, 198 Ill. 431; Wabash R. R. Co. v. Farrell, 79 App. 508; Schwartz v. Berkshire Life Ins. Co., 91 Ill. App. 494; National Union v. Hunter, 99 Ill. App. 146.   The question then arises, did the offer made by counsel relate to a time that made the statements of the deceased, proposed to be proven, material and competent.   As we have before stated, the conversation the witness was about to relate when stopped by an objection, was at corn-planting time 1902.   The offer was to prove statements of deceased "showing that he was in a poor condition of health during the last few months of his life."   This, we take it, must be considered in connection with the conversation the witness was about to relate when stopped, and, therefore, had reference to a time some time during the spring of the year before the insured died in January.   If the witness had been permitted to testify and had stated deceased said in the spring of 1902 his health was bad, this alone could not have justified the assumption in the absence of proof, that it was bad December 22, 1902.   But, according to the testimony, he was seen a number of times between those dates by several witnesses, including two physicians, and talked to by them and his condition of health described so far as appearances indicated.   We are of opinion, therefore, that the refusal to allow the testimony of this witness was not error of such prejudicial character to appellant as, of itself, to justify a reversal of this case.   It will be seen also that there was no offer to prove any specific statement or language of the deceased relating to his condition of health. While the offer of counsel was that he proposed to prove statements showing a poor condition of health during the last few months of the insured's life, it is not stated what those statements were nor the substance of them, but only

counsel's conclusion, and we are inclined to the view that this offer was too indefinite. The language or the substance of it should have been stated so that the court could have seen whether or not it was material. Lucas v. Beebe, 88 Ill. 427; Abbott's Civil Trial Brief 231.

Complaint is also made of the first and fifth instructions given on behalf of appellee. The first was to the effect that the relation between district courts and the supreme court of appellant was that of agency, and that what the district court did by its proper officers in the matter of suspension and reinstatement, was binding on appellant. This instruction is sustained in this state by Order of Foresters v. Schweitzer, 171 Ill. 325; Coverdale v. Royal Arcanum, 193 Ill. 91; Grand Lodge A. O. U. W. v. Lachman, 199 Ill. 140. The fifth instruction contained a statement of the same proposition, and further told the jury if the recorder of the local court accepted from deceased assessments and dues after his suspension, and if they further believed from the evidence he "was a member in good standing upon the books of said local court at the time of his death, and that he had paid all assessments and general dues then owing by him to said order, that is evidence from which the jury might infer that defendant waived the right to declare the contract of insurance forfeited." The complaint made of this instruction is similar to that of the first one, and it is also argued that the statement that the local court might, by its acts, waive appellant's right to insist upon a forfeiture of the contract of insurance is not the law. No criticism is made of the phraseology of the instruction. We are of opinion the proposition of law contained in it is sustained by the authorities hereinbefore cited. On behalf of appellant, the court gave ten instructions and refused two, and it is claimed the refusal of the two instructions was error. In our view of the law, in the ten instructions given for appellant, it had the benefit of all the law applicable to its defense very liberally stated, and we see no error in the refusal of the two instructions.

Believing there is no reversible error in this record, the judgment is affirmed. *Affirmed.*