FRED SORENSON

*v.*

PETER SORENSON.

*Opinion filed February 20, 1901.*

1. ELECTIONS—*when court's denial of a voter's privileges as a witness will not reverse.* The action of the court, on an election contest, in compelling a legal voter to tell for whom he voted and in compelling persons who had cast illegal votes to give incriminating answers, is not ground for reversal if a sufficient number of other illegal votes are proven to sustain the court's judgment of ouster.

2. SAME—*circumstantial evidence is admissible to show how a person voted.* Circumstantial evidence, such as party affiliation, relations with candidates, etc., is admissible to show how a person voted, and is generally sufficient to prove the character of the vote.

APPEAL from the County Court of Kane county; the Hon. M. O. SOUTHWORTH, Judge, presiding.

R. S. EGAN, J. J. KIRBY, and J. R. POWERS, for appellant.

BOTSFORD, WAYNE & BOTSFORD, for appellee.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

The parties to this suit are brothers, who were rival candidates for the office of president of the board of trustees for the village of Gilberts, in Kane county, at an election held in said village on April 17, 1900. Fifty-nine ballots were cast, and on a canvass by the village board it was declared that appellant had received thirty-one votes and appellee twenty-eight. Appellant was declared elected and was installed in office. Appellee filed his petition in the county court to contest the election of appellant, on the ground that ten persons named in the petition who were not legal voters voted at said election for appellant. An answer was filed and the cause was heard. It was conceded that twenty-eight legal votes

were cast for appellee, and the only issue was whether the persons named in the petition were legal voters in the village. The court found and declared that six of those persons were not legal voters; that they voted for appellant; that the number of legal votes cast for him was twenty-five, and that appellee was elected to the office. The court thereupon entered judgment of ouster against appellant.

The qualifications as to residence required by the statute to entitle a person to vote at the village election in question were, residence in the State one year, in the county ninety days and in the village thirty days; and it appears from the evidence that a little more than thirty days before said election there was an unusual accession to the population of the little village where it was to be held. Appellant was a candidate for president of the village board upon what was called the "Independent" ticket, and Frank Pease, who kept a barber-shop and boarding house in the village, was assisting him in his canvass. Ed Frisby was a candidate on the same ticket with appellant for the office of village trustee, and the evidence shows that these parties were actively interested in the increase of the number of voters. Michael Rooney, one of the parties whom the court found was not a legal resident, arrived in the village early in March. Frank Pease provided quarters for him at his boarding house. Rooney cut some wood for a man named Freeman, about two miles from the village, where Ed Frisby told him there was work. Freeman furnished a saw and Ed Frisby an ax to cut the wood. Rooney did not pay his board at Pease's boarding house. There was no agreement about pay for the work, and he was not paid and never asked for it. About two weeks before election he engaged to go to work for a farmer, but told him he would not commence work until after the election, for the reason that he wanted to vote. He testified that this was because the only right he had in America was to

vote and he wanted to use it. He left after the election. Thirty-one days before the election Thomas Martin, whose vote seems to have been counted by the court, had a difficulty, as he testified, with his employer, who was a brother of the candidate Ed Frisby, and he also moved to the village, where he was taken care of at Pease's boarding house. He boarded there until two or three days after the election, when he left. He did not pay any board and slept in the barn. He also got a saw from Freeman and an ax from Frisby and cut some wood for Freeman. Timothy Larkin, whom the court found was not a legal voter, lived with his uncle, William Tobin, a quarter of a mile west of the village. On March 17, 1900, he engaged board in the village with a relative, Mrs. Welch, and gave her an order on one Brayman for his board. He remained there and voted at the election on April 17, and the next day went back to his residence at Tobin's. This voter was in the cow business with Tobin, and testified that he moved into the village for this period because he could operate better in that business in the village than on the farm, on account of competition. The Tobin residence was only half a mile from the depot, and during the thirty-one days this cow merchant did not ship any cows and did not sell any, except one or two to a man nearer Tobin's than the village. Frank Pease had a sister, the wife of D. L. Foster, who lived in Elgin, where he had a house and lot and residence. Foster was a scavenger, and had a son and two men living with him, all of whom were voters. Foster and wife met appellant at Pease's barber-shop, and appellant and Pease told them there would be work at teaming in the village. Foster and wife testified that they said if the right party got in at the election it would be all right and there would be lots of work. Appellant and Pease testified that they were anxious to have a teamster there, and said they thought there would be work and the first one to move in would have the best chance. As a result

of this conversation the Fosters moved to the village with two teams and the son and the two other men, leaving part of their household goods at their home in Elgin, which was placed in charge of their daughter. They also lived with Pease, who did not charge Foster and his wife anything, but the hired men were to pay their board. They lived with Pease until a short time after the election, when they moved into another building. There was scarcely any team work in the village, and after remaining there perhaps a month after the election they moved back to their home in Elgin, where they have since resided. Both Foster and his wife testified that they did not intend to abandon their home in Elgin but came to Gilberts in the hope of getting work there, and if Foster had found work they would have remained while the work lasted.

The recital of these undisputed facts is sufficient to show this immigration to the village of Gilberts was nothing more than a temporary settlement of voters for the purpose of the election. In the cases of Rooney, Martin and Larkin the purpose is too palpable to require any comment. As to the Fosters, it is clear they never abandoned their home in Elgin, either in fact or intention, for the purpose of making Gilberts their home. There were four men of the party,—D. L. Foster, Harvey Eldridge, Henry Paddock and Fred Foster,—and they had two teams. It cannot be believed that they went to the little village of Gilberts, with only fifty legal voters, to do the general teaming of the place. A village of that kind would hold out no such inducements as a place for team work that the Fosters would abandon their home in Elgin and move there. They remained a short time after the election, as appears in their testimony, in the hope that the village would have some work to do.

It is alleged as error that the court compelled some of the parties charged with illegal voting to state for whom they voted. The privilege of refusing to answer

was claimed by Larkin, Rooney and Martin, but the privilege was denied and the objection overruled. A legal voter cannot be compelled to testify for whom he voted. (*Eggers* v. *Fox*, 177 Ill. 185; 10 Am. & Eng. Ency. of Law,—2d ed.—1828.) If a party has cast an illegal vote, it is also a rule that he is not compelled to answer questions when such answers would tend to incriminate him. (11 Am. & Eng. Ency. of Law,—2d ed.—541; *Eggers* v. *Fox, supra.*) The court was in error in denying the privilege claimed by these witnesses, but the judgment cannot be reversed on that account. D. L. Foster, Harvey Eldridge, Henry Paddock and Fred Foster, four of the parties who were not legal voters, all testified voluntarily that they voted for appellant, and claimed no privilege. As their ballots were illegal, that was sufficient to support the judgment and left appellant but twenty-seven legal votes. In addition to that fact, the evidence is entirely sufficient to show that the other parties voted for appellant, regardless of their testimony. Circumstantial evidence, such as party affiliation, relations with candidates, etc., is always admitted to show how a person voted, and is generally sufficient to prove the character of the vote. (10 Am. & Eng. Ency. of Law, —2d ed.—838.) In this case the illegal voters were kept and cared for and the whole business of their colonization in the village was managed by appellant's assistant, Pease, and Frisby, who was on the same ticket with him. There cannot be much doubt for whom they voted, after reading the evidence, without their testimony. The error was not prejudicial to appellant.

The judgment of the county court is affirmed.

*Judgment affirmed.*