CHARLES H. WIDMAYER, Appellee, vs. JOHN R. DAVIS, Appellant.

*Opinion filed December 17, 1907.*

1. PLEADING—*when amendment to a petition to contest election does not introduce new cause of action.* An amendment to a petition to contest an election, giving the names of the persons claimed to have voted illegally at the election, does not introduce a new cause of action, where one of the grounds for the contest alleged in the petition was that illegal votes were cast, although the petition did not name any of the alleged illegal voters.

2. TRIAL—*motion for continuance is addressed to sound discretion of the court.* The sufficiency of the grounds stated in an affidavit in support of a motion for continuance is a matter resting in the sound discretion of the trial court, and the ruling will not be reviewed by an appellate tribunal unless there is a manifest abuse of such discretion.

3. SAME—*motion for security for costs should be made early.* Motions for security for costs, made after the defendant to a petition to contest an election has filed his answer and the trial has been entered upon, are properly overruled, where no reason is shown to justify the delay in making the motions.

4. ELECTIONS—*person is not a legal voter in the district where he merely takes his meals.* Persons who room in one voting district and take their meals in another are not legal voters in the latter district.

5. SAME—*one does not retain residence in one district by keeping keys to house after he has moved.* One who moves from the house where he has resided into another election district just before the election, does not, by leaving some clothing in the house and keeping the keys thereof for the sole purpose of preventing the loss of his vote, retain his legal residence in the former district, and he is not entitled to vote there.

6. SAME—*what does not show that person was not legal voter.* One who returns to a city, just previous to an election, from another city where he had gone several months before with his fam-

Note:—The opinion in this case specially calls the attention of members of the bar to the importance of observing rule 14 of the Supreme Court, relating to the preparation of the abstract of record, which provides: "The abstract shall contain a complete index, alphabetically arranged, giving the page where each paper or exhibit may be found, with the names of the witnesses and the pages of the direct, cross and re-direct examination."

ily is not shown to be an illegal voter, although he kept house in the latter city and was registered there as a voter, where the evidence shows that he made no affidavit for registration there and that he had left part of his property in the former city with the intention of returning there.

7. SAME—*neither vote can be counted where person votes twice.* If a person is shown by the evidence to have voted twice at the election, and it is shown for which candidate he voted, two votes should be deducted from the votes cast for such candidate.

8. SAME—*court is not concluded by testimony of witness as to whom he voted for.* Where persons testifying in an election contest case are shown to have been illegal voters and to have perjured themselves in their affidavits, the court is not bound to believe their voluntary testimony as to which candidate they voted for, and if the evidence of their party affiliation, connection with the candidates, etc., tends to show that they voted for the other candidate the court may so find, and its finding will not be disturbed.

9. SAME—*when court is justified in rejecting votes for certain candidate.* Where the evidence in an election contest warrants the finding that some fourteen men in the employ of a contractor were not legal voters, in that they did not room at the contractor's house, as was stated in the affidavits of the witnesses who swore their votes in, and it is further shown that the contractor and the witnesses who swore in the votes were active partisans of one candidate, the court is justified in finding the illegal votes were cast for such candidate, where the voters themselves cannot be found to testify at the trial.

10. SAME—*effect where witness to affidavit of challenged voter does not reside in voting district.* If a party casting a ballot, after challenge, is, in fact, a legal voter, and the judges accept the ballot and deposit it in the ballot-box, the fact that the party who was the witness to his affidavit did not reside in the election precinct where the vote was cast, as required by law, does not require that the vote be held illegal and the ballot rejected.

APPEAL from the Circuit Court of Morgan county; the Hon. OWEN P. THOMPSON, Judge, presiding.

WORTHINGTON & REEVE, and M. T. LAYMAN, for appellant.

WILLIAM N. HAIRGROVE, and ROBERT TILTON, (WILLIAM BROWN, of counsel,) for appellee.

Mr. Justice Farmer delivered the opinion of the court:

Appellant was the candidate of the republican party for re-election to the office of mayor of the city of Jacksonville at the election held in April, 1907, and appellee was the candidate of the democratic party for said office. A canvass of the returns showed appellant received 1376 votes and appellee 1355 votes. Appellant was thereupon declared by the city council duly elected mayor of said city of Jacksonville. On the 27th of April appellee filed in the circuit court of Morgan county a petition to contest said election. The petition charged irregularities and errors on the part of the election judges in counting the votes; that in certain districts votes were counted for appellant that should have been counted for appellee; that votes were received and counted for appellant in violation of the election laws of the State, and that in certain election districts large numbers of persons voted for the appellant who were not legal voters. The petition charged that the appellee received a plurality of the lawful votes cast at said election, and prayed for a re-count of the ballots and that all ballots unlawfully cast be rejected, etc. No names of persons who had unlawfully voted at said election were stated in the petition. May 18 appellant demurred, generally and specially, to the petition. June 8 the court entered an order sustaining the demurrer and granting appellee leave to amend. On the 12th of June appellee filed an amendment giving the names of a number of persons alleged to have unlawfully voted for appellant. Appellant moved to strike the amendment from the files on the ground that it set up a new cause of action and was filed after the time allowed by law for filing a petition to contest an election. This motion was overruled, and appellant thereupon demurred generally and specially to the petition as amended. On the 14th day of June the court entered an order sustaining the demurrer and granting leave to appellee to amend. On the following day appellee filed what is called in the record the second amended petition.

On the 17th day of June a rule was entered against appellant to answer the petition the following day. Appellant demurred to the second amended petition. The demurrer was sustained and leave granted petitioner to further amend. June 18 appellee filed an amendment to the second amended petition, and the following day a rule was entered against appellant to answer by the succeeding Friday, and on June 20 he filed his answer. The trial was entered upon June 26 and the evidence heard from time to time, with several adjournments for a few days at a time, until July 29, when the hearing was concluded. July 9 appellee filed an amendment to his petition, setting forth the names of a large number of men who were alleged to have voted illegally. These were in addition to the names theretofore set forth in the petition as amended. On the same day appellant filed a motion, supported by affidavit, for a continuance, on the ground that he had been taken by surprise by the amendment and was unprepared to proceed with the trial. The motion for a continuance was denied and the hearing resumed July 10. On that day further hearing was adjourned until July 15, and on July 16 the hearing was adjourned to July 20. No answer had been filed by appellant before July 20 to the amendment to the petition filed July 9. On said date, July 20, in obedience to a rule entered by the court July 16, appellant filed his answer to said amendment. None of the amendments to the petition were sworn to until July 10. July 3 appellant made a motion, supported by affidavit, for a rule on the appellee to give security for costs. This motion was overruled and another motion made July 9 for a rule requiring the appellee to give security for costs. This motion was overruled also.

It is contended by appellant the court erred in denying his motion to strike from the files the amendment to the petition filed June 12. That amendment gave the names of persons who were charged with voting illegally at the election, and appellant claims that as the original petition men-

tioned no names of alleged illegal voters, this amendment introduced a new cause of action, and, as it was filed more than thirty days after the election, should have been stricken from the files. With this we cannot agree. The petition was filed to contest the election, and one of the grounds for the contest alleged in the petition was that illegal votes had been cast for appellant. The original petition did not state the names of the alleged illegal voters, and the amendment giving their names was not the introduction of a new cause of action.

It is also insisted by appellant that the court erred in permitting the amendment of July 9, which was made during the trial and after it had been in progress several days. Our statute on the subject of amendments is liberal, and nothing is shown from which it appears the court abused the discretion conferred upon it by the statute in the allowance of amendments, or that appellant was injured or prejudiced by permitting the amendments to be made. Appellant was not required to, and did not, file his answer to that amendment until July 20, and no objection was made by him to the hearing proceeding on the ground that no answer had been filed. He was given ample time to prepare and file his answer, and we think this alleged error without support.

It is also said, as the answer to the original petition as amended, and a replication thereto, were filed prior to July 9, and as no rule was entered granting leave to withdraw the replication, the court erred in ruling appellant to answer said amendment. We are unable to find in either the abstract or the record that appellant interposed any objection to the rule of court requiring him to answer the amendment of July 9.

It is further contended by the appellant that the court erred in overruling a motion for a continuance made by him July 9, and the two motions made by him to rule appellee to give security for costs. The sufficiency of the

grounds stated in the affidavit in support of the motion for a continuance was addressed to the sound discretion of the court, and the exercise of such discretion will not be reviewed by an appellate tribunal unless there has been a manifest abuse of such discretion. (*Condon* v. *Brockway,* 157 Ill. 90.) No such abuse appears from this record. Both motions to require appellee to give security for costs were made after answer had been filed and the trial entered upon. No reason is shown to justify the delay in making these motions, and they were properly overruled. *Papineau* v. *Belgarde,* 81 Ill. 61; *St. Louis, Alton and Terre Haute Railroad Co.* v. *South,* 43 id. 176.

After making the preliminary proof as to the care of the ballots they were opened and counted. The court found 1357 ballots had been cast for appellant and 1346 for appellee. No objection was made to the count except as to one ballot not counted. Appellee excepted to the ruling of the court in not counting this ballot for him.

The court found that F. G. Dodge, Edward McKenny, William H. Thompson, Samuel Heller, Isadore Stein, W. C. Gray and Charles Arenz were not legal voters; that they had voted at the election for appellant, and deducted seven votes from the number of votes accredited to appellant.

Gray was a convict out of the penitentiary on parole. He testified he voted for appellant, and the correctness of the court's ruling in deducting his vote from appellant is not questioned.

Heller and Stein voted in the Second ward. They were not registered and swore their votes in. They produced a colored man by the name of Johnson as a witness, who made affidavits that they were residents of the voting district in which they had offered to vote and were entitled to vote therein. In the affidavits made by Heller and Stein each swore he resided in the first voting district of the Second ward and was entitled to vote at the election. In the affidavit of the witness Johnson he stated that each of them

resided "at Talbott's, West State street." A woman named Jettie Reinback testified she lived at 215 East Morgan street, in the Third ward; that Heller and Stein had roomed at her house since before Christmas, 1906, but that they did not take their meals there. W. S. Talbott conducted a restaurant in the Second ward. He testified Heller and Stein ate most of their meals at his place but never roomed or lived there. Heller testified he roomed at 215 East Morgan street and took his meals at Talbott's. He worked for Jacob Cohen. Stein did not testify. Johnson, the witness who made affidavit for Heller and Stein, testified he did not know Stein and had no recollection of having made affidavit for either of them. He testified Heller worked at Cohen's and lived at his house before the election. In this he was clearly mistaken. While Heller did not testify how either he or Stein voted, the evidence clearly warranted the court's finding that they voted for appellant, and as the evidence clearly shows they were not legal voters the court properly deducted two votes from appellant as having been cast by them.

F. G. Dodge voted in the first district of the Fourth ward. He had lived there for a year or more but prior to the election moved into the first district of the Second ward. He testified he kept some clothing in the place he moved from in the Fourth ward and kept the keys to the house, in order that he might be entitled to vote. He gave up the keys to his landlord the next day after the election. Robert Dan testified he owned the house Dodge moved from, and that he told Dodge he was not going to rent the rooms any more, and that he (Dodge) had better keep the keys until after the election. Charles Elliott testified to the house being vacant after Dodge moved from it, and that Dodge told him he had left some clothing in the house to retain his residence there. Retaining the keys to the building under the circumstances shown by the testimony after moving into another ward did not make him a resident of the ward he

moved from, and he was not entitled to vote in that election district. Dodge testified he had always been a republican, and though he did not testify as to which candidate he voted for for mayor, it is not questioned that he voted for appellant. The court properly found his vote was illegal; that it was cast for appellant and deducted it from appellant's vote.

W. H. Thompson took his family and went to Springfield in November, 1906, to work in the Wabash machine shops in that place. On the 16th of March he was injured, and with his family moved back to his father's house, in Jacksonville. While in Springfield he kept house and was registered as a voter there but testified he made no affidavit to procure the registration. M. L. Hildreth testified William H. Thompson said he was going to Springfield temporarily; that he was going to try Springfield a month or two to see how he liked it, and that he said he had left part of his things at his father's house. Joseph Thompson, the father, testified the son said he could not get work in Jacksonville and was going to Springfield to work awhile but was coming back, and that he did not take all of his things with him to Springfield. We do not think this evidence was sufficient, under the previous decisions of this court, to justify holding that Thompson abandoned his residence in Jacksonville when he went to Springfield, and was therefore not a legal voter. *Palmer* v. *Riddle*, 197 Ill. 45; *Imhoff* v. *Lipe*, 162 id. 282; *Kreitz* v. *Behrensmeyer*, 125 id. 141; *Wilkins* v. *Marshall*, 80 id. 74; *City of Beardstown* v. *City of Virginia*, 81 id. 541.

The proof shows Charles Arenz had moved from the election district in which he voted, in the early part of April prior to the election. It is not insisted that he was a legal voter, but the court found he voted for appellant and deducted one vote from him on that account. Appellant contends the evidence was insufficient to justify the finding that Arenz voted for appellant. The court explained to

231—4

the witnesses who were charged with having voted illegally, that they would not be required to state for whom they voted if they did not desire to do so. Arenz did not testify for which candidate he voted. He testified he was a democrat, and denied having voted at the republican primaries the previous year and denied he had ever claimed to be a republican. Appellee introduced in evidence the records of the primary election held the previous year, which showed Charles Arenz voted as a republican in said primaries. Charles E. Hines testified Arenz told him before election day that he (Hines) ought to vote for appellant. C. H. Dahman testified he had known Arenz all his life; that he was a republican; that he had heard him so express himself, and that his family was republican. Upon being called as a witness by appellant, Arenz testified that he did vote at the republican primary election the previous fall; that his uncle was a candidate for nomination for office on that ticket. He further testified he was a democrat "nationally" but split his ticket in several elections, and did so at the city election. He testified he did not remember telling Hines he ought to vote for appellant.

The court found Arthur Taylor voted twice. Taylor testified he lived at the house of William Nunes, 832 Independence avenue, which was in the first district of the First ward, and he voted there. His mother, Annie Taylor, lived at No. 359 North West street, which was in the Second ward. She testified Arthur did not live with her but lived with William Nunes. A man named Arthur Taylor voted in the Second ward. He swore his vote in, stating in his affidavit that he resided in the first district of the Second ward, and G. A. Postley, a witness for him, made affidavit that Arthur Taylor was an inhabitant of said voting district and resided at 359 North West street, which was the number of his mother's residence. Taylor was a young colored man and had served a term in the reform school. He first testified he belonged to no political party, and

afterwards testified he was a democrat and voted for appellee. He said he had worked for William Nunes eleven years and that Nunes was for appellee for mayor. James Ramey testified to meeting Arthur Taylor on the street, and that Taylor said they were after him for voting at the election and he was going to leave; that he voted for appellant but swore that he voted for appellee, and that William Nunes told him to do so. James Hurst testified he was one of the clerks of the election of the first district of the First ward; that he and Mr. Pires, a republican judge of election, assisted Taylor in marking his ticket; that Taylor said he wanted to vote for appellant for mayor and witness marked his ticket for appellant. Pires, who was an employee of William Nunes, testified Taylor was not assisted. The evidence abundantly justified the court finding Arthur Taylor had voted twice, and if it was shown for whom he voted, two votes should be deducted from the votes cast for that candidate. (*Behrensmeyer* v. *Kreitz,* 135 Ill. 591.) The court found he voted for appellant and deducted the two votes from appellant's votes. This, it is insisted, was not warranted by the evidence and was erroneous.

It is not denied that Edward McKenny was an illegal voter. He had been convicted of a felony, sentenced to the penitentiary and was out on parole. He was a colored man and testified he voted for appellee. Just before the election he was working for A. F. Franks on a street paving contract at Carrollton, Illinois. Franks was a contractor, resided in Jacksonville and was the challenger for the republican party in the first district of the Second ward at the election. McKenny testified he came from Carrollton to Jacksonville to vote, on transportation furnished him, the cost of which was to be deducted out of his wages. He swore his vote in. William Bolan made affidavit for him as a witness. Bolan worked on the streets as an employee of the city and sometimes acted as a special policeman.

The court found McKenny voted for appellant and deducted one vote from him on that account, and this appellant claims was erroneous.

It cannot be denied that there was evidence tending to support the court's findings that Taylor, McKenny and Arenz voted for appellant, notwithstanding Taylor and McKenny swore they voted for appellee and Arenz testified he was a democrat "nationally." In fact, every circumstance shown by the evidence as to their associations and affiliations tends to support the court's findings. William Nunes, for whom Taylor worked, the record shows was an active partisan for appellant, though Arthur Taylor swore he was for appellee. McKenny went from Carrollton, where he was at work for Mr. Franks, a republican and supporter of appellant, to Jacksonville to vote, on transportation furnished him, the cost of which was to be deducted from his wages. Other evidence which we have before set out in substance shows these men to be untruthful and unreliable. Arenz contradicted himself, and while he swore he was a democrat "nationally," there was other proof that he had always claimed to be a republican and that his family was republican. All three of these witnesses perjured themselves in their affidavits that they were legal voters. In addition to what appears upon the record, the trial court saw the witnesses and heard them testify. In such case the error in the finding of facts must be clear and palpable to justify a reversal. *Dowie* v. *Driscoll,* 203 Ill. 480; *Biggerstaff* v. *Biggerstaff,* 180 id. 407; *Baker* v. *Rockabrand,* 118 id. 365; *Fabrice* v. *Von der Brelie,* 190 id. 460.

*Sorenson* v. *Sorenson,* 189 Ill. 179, was an election contest, the grounds of the contest being that a number of persons who were not legal voters had voted for one of the candidates for president of the board of trustees of the village of Gilberts, in Kane county. By the returns as canvassed by the village board it appeared the appellant had received 31 votes and appellee 28. The trial court held

6 illegal votes had been cast for appellant and declared appellee elected. It appears a man who was assisting appellant in his campaign, and another one who was running on the same ticket with appellant and actively interested in its success, procured seven men to come to the village a little more than thirty days before the election for the purpose of voting at said election. On the trial the county court compelled three of the alleged illegal voters, over their claim of privilege, to testify for whom they voted. This was held to be erroneous, but four others who did not claim their privilege testified they voted for appellant. The court said (p. 183): "As their ballots were illegal, that was sufficient to support the judgment and left the appellant but 27 legal voters. In addition to that fact, the evidence is entirely sufficient to show that the other parties voted for appellant, regardless of their testimony. Circumstantial evidence, such as party affiliation, relations with candidates, etc., is always admitted to show how a person voted and is generally sufficient to prove the character of the vote. (10 Am. & Eng. Ency. of Law,—2d ed.—838.) In this case the illegal voters were kept and cared for and the whole business of their colonization in the village was managed by appellant's assistant, Pease, and Frisby, who was on the same ticket with him. There cannot be much doubt for whom they voted, after reading the evidence, without their testimony. The error was not prejudicial to appellant."

That a witness who is unworthy of belief testifies positively to a fact does not require the court to believe him nor bind the court to find the fact as testified to, when, from all the other evidence and circumstances proven and from the appearance and demeanor of the witness, the court is satisfied such witness has testified falsely or has been mistaken. Men have often been found guilty of crimes, even in capital cases, on the circumstances proven, notwithstanding the party charged may have sworn he did not commit the crime. In *Rexroth* v. *Schein,* 206 Ill. 80, we

said (p. 97): "Circumstantial evidence may be resorted to in order to purge the ballot of illegal votes. The party affiliations of the voter have been uniformly held sufficient to raise the presumption that he cast his ballot for the nominees of the political party of which he was a member, and this proposition, in the absence of any countervailing proof or circumstances, is, it seems, to be accepted as determining for whom the voter cast his ballot." In the absence of the testimony of Taylor and McKenny that they voted for appellee, and of Arenz that he was a democrat "nationally," we apprehend it would not be questioned that the evidence was sufficient to justify finding they voted for appellant. Neither can it be denied that the proof tended materially to discredit their truth and veracity. Furthermore, the trial court saw and observed them on the witness stand, and therefore had better opportunities for determining the weight and credit that should be given their testimony than we have, and the finding that they voted for appellant cannot be disturbed on the ground that it was clearly and palpably against the weight of the evidence. *Choisser* v. *York,* 211 Ill. 56.

The court found that fourteen men, namely, Mike Munnigal, Emanuel Kelly, Quillie Reading, Wallace LeWright, Reece James, Joseph DeWitt, Charles Davis, Warren Eaton, Dolphus LaDuke, Joseph Seeley, Percy Brown, Warren Mitchell, Ron Hendricks and Clay Brice, voted illegally in district 1 of the First ward; that they each voted for appellant, and reduced appellant's vote to the extent of fourteen. All of said parties swore their votes in, and all swore they were residents of and voters in the first district of the First ward. Robert Fortado, son-in-law of William Nunes, made affidavits as witness for eleven of them, and Sam Nunes, who was not related to William Nunes but who had been in his employ many years, made affidavits as witness for three of them. All of the affidavits of the witnesses, except those for Ron Hendricks and Clay Brice,

stated the party offering his vote resided in the first precinct of the First ward, at 832 Independence avenue. The witness' affidavit for Ron Hendricks gave his residence as Independence avenue, no street number given. The witness' affidavit for Clay Brice stated Brice resided in the first district of the First ward, but gave no street or number. No. 832 Independence avenue was the residence of William Nunes, and all fourteen of these men claimed that as their residence. William Nunes was a contractor and frequently had in his employ large numbers of men. It was claimed these men were employees of his and made their homes at his residence. Mr. Nunes testified there were eight rooms in his house and a basement with a concrete floor, containing four rooms, with seven or eight beds in them; that between the last of January and the first of May he had between forty and forty-five men boarding and sleeping at his house and in his barn; that the fourteen men whose names are above mentioned were a part of them. George Nunes, a son of William Nunes, testified he lived at home with his father; that the fourteen men named worked for his father and at least some of them slept and made their homes there, but as to this his evidence is not very clear and satisfactory. Robert Fortado, son-in-law of William Nunes, testified to the fourteen men residing at his father-in-law's house, but there were such conflicts and inconsistencies in his evidence as to impair its weight and value. For instance, he testified he knew Emanuel Kelly but did not know where he lived election day, yet he was the witness who assisted Kelly to swear his vote in and in his affidavit he swore Kelly lived at 832 Independence avenue. He testified he knew Wallace LeWright and made an affidavit for him as a witness to enable him to vote, in which he stated LeWright's residence was 832 Independence avenue, but he testified he could not say whether LeWright was a colored man or a white man. He was a member of the police force by appointment of appellant, and testified

he was actively engaged, before and on the day of election, in working for the whole republican ticket. Some other testimony, not definite in character, offered by appellant tended to corroborate the testimony of William and George Nunes and Fortado. Mary Nunes, wife of William Nunes, called on behalf of appellee, testified she had resided with her husband at 832 Independence avenue twenty-one years; that the house had seven rooms, four of them bed-rooms; that the family living there consisted of herself and husband and four grown children. She testified they boarded a good many men but that they did not room there; that none of the men roomed there in March or April but went home. The witness testified she did not know any of the fourteen men above named, except Emanuel Kelly; that neither he nor any of the others ever lived at her house; that if they had lived there she would have known them. Grace DeFreitas, a daughter of William Nunes, called for appellee, testified she had lived in her father's house, 832 Independence avenue, the past two years and a half; that she did housework; that they had "all kind of men working there, in and out," whom she did not know, but that no one except her father, mother, brothers and sister roomed or lived at their house; that occasionally men who worked for her father took their meals there but did not board there regularly. Witness testified she did not think any men boarded at their house in April, but could not be positive. Her father's contracts were mostly for work out of the city of Jacksonville. She testified if any men slept in the barn she never knew it; that she made the beds in the house but never made any beds in the barn, and if there were any beds in the barn she did not know it. There was other evidence, less definite in character, tending to show that none of these fourteen men had lived at the house of William Nunes. All of them but Hendricks had left Jacksonville before the trial and could not be found by the officers who had subpœnas for them. Hendricks testified he

had lived' at William Nunes' house five or six years; that he ate and slept there during that time. His testimony is in conflict with that of William Nunes and is directly contradicted by the testimony of Mrs. Nunes and Mrs. DeFreitas. The evidence amply warranted the court in finding said fourteen men were illegal voters. There was no direct evidence as to how any of them voted except Hendricks. They were all claimed to be employees of William Nunes, and were assisted in swearing their votes in by his son-in-law, Fortado, and Sam Nunes, who had been in his employment for years. We have before referred to the activity of William Nunes and Fortado as partisans of appellant, and it would serve no useful purpose to set out in detail all the evidence upon that subject. We may observe, however, that William Nunes' zeal for his party ticket was such as to lead him to acts of questionable conduct in and about the polls. His and Fortado's relations to and interest in these fourteen men and in their voting, together with other evidence in the record, justified the court, under the authorities above cited, in finding they voted for appellant and in deducting that number of votes from appellant's vote.

It is also insisted by appellant that the court erred in not finding William Layman, Harvey Burchard and Omar Harrison were illegal voters and deducting their votes from the votes of appellee. Layman was employed by the city, in March before the election, to work at Nichols Park, which was outside the city limits, and moved out to the park. He testified he did not move out there for the purpose of making that his home, but only intended to stay there until he was through with his job and then move back to town; that he held the ward from which he moved as his residence and home though he owned no property in that ward. His case is similar to that of W. H. Thompson, above discussed, and the court was justified in holding him to have been a legal voter. The objection to the votes of

Burchard and Harrison is not that they were not legal voters at the places where they voted. Their votes were challenged, and the witness' affidavit for each of them was made by parties who were not voters in the district and ward where Burchard and Harrison voted. The law provides that the witness for a challenged voter shall be a resident in the precinct or district where the voter casts his vote, but where the party casting the ballot is a legal voter and the judges accept the ballot and deposit it in the ballot-box, the fact that his affidavit was not supported by a witness residing in the election district does not require that the vote should be held illegal and the ballot not counted. *Clark* v. *Robinson,* 88 Ill. 498.

The court held that Stephen Knowles, Robert Montgomery, John Boland, John Damron, Jerry Condon, O. L. Holloway and Roy McLamara were illegal voters; that they voted for appellee, and deducted seven votes from the vote credited to appellee. Appellee has assigned cross-errors on the ruling of the court in finding that Montgomery and Knowles were not legal voters, and in holding that Damron, Boland and McLamara voted for him. Montgomery and Knowles were unmarried men and had some years previous to the election resided in the Third ward, where they voted. Both had moved out of the Third ward some years prior to the election and had not subsequently resided in or acquired a residence in said Third ward, though at elections previous to the city election in 1907 both had voted in the Third ward. The court correctly held they were not legal voters in that ward, and as the evidence showed they voted for appellee, two votes were properly deducted from him on that account. It is not denied that the court correctly held Damron was not a legal voter, but it is claimed the evidence is not sufficient to show that he voted for appellee. He was a colored man and a hod-carrier by occupation. He testified he sometimes voted the republican ticket and sometimes the democratic ticket,

but at this election he voted for appellee, and appears to have had some grievance or special reason for doing so. He further testified he told Captain Kennedy, of the police force, an active supporter of appellant, prior to the election, that he was going to vote for appellee. Captain Kennedy corroborated him in this statement. We cannot say the court was not justified in finding from the evidence that Damron voted for appellee. John Boland testified he was a democrat, but did not say for whom he voted for mayor. A witness called by appellee testified that some years prior to the election in 1907 he was a candidate against appellant for mayor in the city of Jacksonville, and that Boland told him he was for appellant in that election and that of late years he had voted for more republicans than democrats. This is all the evidence we find in the record as to Boland's politics or as to how he voted, and we would not be justified in disturbing the finding of the court that he voted for appellee on the ground that such finding was palpably contrary to the weight of the evidence. Roy McLamara, a saloon-keeper, was called as a witness for appellant, and testified he had always been a democrat and that he voted the straight democratic ticket at the city election. We find nothing in the evidence that would have justified the court in holding otherwise.

A cross-error is also assigned on the ruling of the court in refusing to count for appellee ballot No. 211 of the first district of the First ward, but the ballot itself is not before us nor is there any *fac simile* of it in the record or abstract.

The result of the count of the ballots by the court gave appellant 1357 votes, appellee 1346 votes. From appellant's vote the court deducted 23 as illegal votes cast for him. These 23 illegal votes were found by the court to have been cast by the fourteen men above named who claimed William Nunes' house as their residence, and by Dodge, McKenny, Thompson, Heller, Stein, Arenz, Gray, and two by Arthur Taylor. Our conclusion is the vote of Thompson

should not have been deducted. Deducting the 22 illegal votes we have held the court was justified in deducting from the appellant's vote, leaves his total vote 1335. Deducting from the vote of appellee 7, the number of illegal votes found by the court to have been cast for him, leaves appellee's total vote 1339,—a majority in his favor of 4. We find nothing in the record that would justify us in changing this result, and the judgment of the circuit court is affirmed.

We feel it is due the court, before concluding this opinion, that we call attention to the utter failure to comply with rule 14 in the preparation of the abstract. That rule provides: "The abstract shall contain a complete index, alphabetically arranged, giving the page where each paper or exhibit may be found, with the names of the witnesses and the pages of the direct, cross and re-direct examination." More than forty witnesses testified for appellant and more than one hundred for appellee. The index to the abstract contains the names of the witnesses. They are arranged in columns, one column to the page. The names of appellee's witnesses make four columns the full length of the page and appellant's two and one-half columns. No attempt has been made to arrange the names in alphabetical order. The given name of each witness is printed before the surname. When we have desired, as we frequently did, to refer to the testimony of a witness in either the abstract or the record, we were obliged to begin at the top of the column of names and read down until we found the name. Some of the witnesses were called to the stand more than once, but this does not appear from the index, and this was the cause of much confusion. A very large number of exhibits were introduced in evidence and an examination of many of them was necessary. Only a very few of them were referred to in the abstract, and we were compelled many times to search through a record of more than eight hundred pages to find exhibits we desired to examine. A compliance with the rule in the preparation of the abstract

would have greatly lightened the labor and shortened the time required to prepare the opinion. It doubtless never occurred to counsel that by disregarding the rule the labor imposed upon the court was greatly increased. The rule was adopted to enable the court to promptly dispatch business. The amount of business that comes before this court makes it necessary that we have some rules with reference to the way cases shall be prepared for presentation to us that will facilitate our work. None of our rules impose any hardship on counsel or litigants, but the disregard of a rule, as in the present instance, may greatly increase the labors of the court. As this is not the only case we have had where the rules have been to a greater or less extent disregarded, we have thought best to take this method and opportunity of calling the attention of the bar to this matter, fully believing, when their attention is called to it, they will gladly endeavor to comply with our rules and co-operate with us in dispatching the work of the court.

*Judgment affirmed.*