DUANE T. LEACH, Petitioner-Appellant, *v.* DOLORES J. JOHNSON, Respondent-Appellee.

(No. 73-259; ■■■

Fifth District—July 3, 1974.

714

James W. Sanders, of Marion, for appellant.

Charles W. Phillips, of Ridgway, for appellee.

Mr. JUSTICE CARTER delivered the opinion of the court:

On December 4, 1972, the appellant, Duane T. Leach, filed a petition for the contest of an election to the office of State's Attorney, Pope County. Appellant was the candidate for the Republican Party. Appellee, Dolores J. Johnson, was the candidate for the Democratic Party.

The official canvass of votes found that appellee received 1,112 votes and appellant, 1,111. Appellant requested a discovery recount, and the recount showed that appellant did receive a greater total vote than the appellee. The discovery recount involved Golconda Poll 2 and Golconda Poll 1. For Poll 2 the recount disclosed that the appellee received fewer votes than were counted by the election officials. For Poll 1 it disclosed that the appellant received more votes than were shown by the count of the election officials and that appellee received fewer.

At the trial, evidence was presented regarding the preservation of the ballots and the court ruled that they had been properly preserved. Ballots were then counted in Golconda Poll 2, appellant having amended his petition to withdraw his request for a count of the ballots in Poll 1. Evidence was then presented regarding illegal voting in Poll 2. Following the presentation of all the evidence by both sides regarding illegal voting, the court found that the appellant had received a total of 1,079½ votes and the appellee 1,085½ votes and that appellee was duly elected to the office of State's Attorney of Pope County.

Both appellant and appellee raise a number of issues. We will first dispose of the contention by both appellant and appellee that the trial court erred in permitting the other to amend pleadings during the course of the trial. Appellant alleges error in that the court permitted appellee to amend her pleadings so the question of illegal voting could be raised with regard to Poll 2. Appellee alleges error in that the court permitted

appellant to present evidence as to illegal votes when such was not alleged in his petition.

■■■ It is well established that permission to amend pleadings is a matter within the sound discretion of the trial court and the court's ruling will not be disturbed unless there is evidence that this discretion was arbitrarily exercised. The record in this case does not show that this discretion was abused. On the other hand, the record shows that the court was painstaking in its attempt to get at the substance of the election contest. Allowing either or both parties to raise the question of illegal voting as further information about the election was disclosed during the course of the trial seems to us to have been a reasonable and not an arbitrary determination.

Three major issues are presented: (1) were the ballots properly preserved; (2) if it is determined that they were properly preserved, should all the votes in Poll 2 have been thrown out; (3) if all the votes in Poll 2 should not have been thrown out, was it proper for the court to accept evidence of party affiliation for purposes of determining how to subtract votes from the respective candidates. We shall deal with these issues in the order in which they are expressed above.

Appellee argues that appellant did not sustain the burden of showing that the ballots were properly preserved and that therefore the results of the official canvass should not be disturbed.

Section 17-20 of the Election Code (Ill. Rev. Stat., ch. 46, sec. 17-20) provides that after votes have been canvassed at a polling place and the result proclaimed and transmitted to the office of the county clerk, election judges:

> "*   *   *   shall fold or roll all of the ballots which have been counted by them, except those ballots which have been in the ballot box but have not been counted and marked 'defective' or 'objected to,' securely bind them lengthwise and in width, with a soft cord having a minimum tensile strength of 60 pounds, and wrap the same with heavy wrapping paper on which the judges of election shall write their signature and seal the package with transparent adhesive tape over the signatures and around the package lengthwise and crosswise so that the ballots cannot be removed from the package without breaking the seal and the transparent adhesive tape and disturbing the signatures, and enclose the ballots so wrapped, together with the envelope containing the ballots marked 'defective' or 'objected to,' in a secure canvas covering, which the judges of election shall sign and seal with transparent adhesive tape as above specified."

This section further provides that two precinct judges, one from each

political party, shall be elected to transmit the ballots to the clerk or to the Board of Election Commissioners, where they shall be carefully preserved for 2 months.

Appellee introduced evidence to show that six separate changes had taken place in the condition of the canvas bag containing the ballots. There was conflicting testimony about just how the canvas bag had been bound with cord and tape, so it is difficult to determine just what changes might have taken place in the binding or taping on the canvas bag. There was no evidence that the sealed envelope within the bag containing the ballots had been opened or tampered with in any way. In *Crum v. Green*, 68 Ill.App.2d 246, 251, the court said: "We do not agree that the testimony shows that unauthorized persons had access to the ballots. In nearly every case it is possible that someone who was not authorized could have access to the ballots. We believe that this principle must be taken to mean access which would enable one to tamper with the ballots without the result being observed. All of the facts and circumstances must be considered. Any persons who tampered with the ballots in this case would have to untie the bags or cut them and unwrap the sealed packages of ballots and reseal them."

As appellant points out, for the ballots to be tampered with, the bag would have to be cut or the tape cut off and the bag opened. The ballots would have to be unwrapped from their paper wrapping, the stack of ballots altered in some manner and the ballots rewrapped and placed in the bag. Then the bag would have to be retied and retaped. All this would have to be done during business hours when the vault was being monitored.

Whether or not there is such tampering as to result in improper preservation is a question of fact for the judge to consider. In the instant case, after the evidence was in, the trial court said: "I have listened to the evidence that the respondent has produced here and observed the demeanor of witnesses who testified, and the court is aware that some of the requirements of the statute pertaining to the conduct of an election to the handling of the ballots and the wrapping, etc., may not have been complied with, but in the absence of fraud the court cannot refuse to admit them  *  *  *.  I don't consider the discrepancy in the application and the numbering of ballots—the preponderance of the evidence shows that they were straightened out after the polls closed.  *  *  * First of all, there is not one scintilla of evidence but what the ballots that were cast reached the Clerk's office. There is not one scintilla of evidence that anyone ever changed the way they were sealed except at the record.  *  *  *  Somebody has to handle these ballots and Mr. Baker [the County Clerk] has testified repeatedly and as recently as ten

minutes ago that they are in the same condition as they were when delivered to his office and I can't make something out of nothing. * * * I reviewed all of the evidence and with the assistance of the reporter reviewed a lot of it verbatim and I read a lot of the cases hoping I could grant your first motion, because if I could we could have been 90% done, and I have no desire to go into these ballots from a personal standpoint. All I want to see is that we have a fair hearing here in court, and my personal wishes don't apply. * * * I have to deny the motion. It will be the order of the court that the motion of the Respondent to dismiss the cause at the close of all evidence concerning the preservation of the ballots is denied."

As the court indicated, the whole case could have been disposed of by ruling that the ballots had not been properly preserved. The record discloses to us that the trial court was thorough in considering the facts and was knowledgeable about the law regarding the preservation of ballots. We see no reason to disturb his finding.

Appellant argues that because of errors and irregularities the results of Golconda Poll 2 should be disenfranchised. His principal arguments are that a large number of nonresidents including some 35 or 36 Job Corpsmen living near Golconda were permitted to vote and that the court was wrong in using party affiliation as a test for deducting illegal votes. This second argument is not germane since it has nothing to do with irregularities in the conduct of the election but rather with the method of handling illegal votes when an election has been contested.

■■ Whether or not the voting of nonresidents in a precinct is sufficient to disenfranchise the whole precinct depends on a number of factors which again must be determined by the trial judge. Not only the number of such illegal votes in comparison to total votes cast in the precinct but also the methods which might have been used to procure these votes become important. As appellant points out, courts are reluctant to disenfranchise a precinct and for obvious reasons. In this case the number of illegal votes constitutes a small percentage of the total; there is no allegation that fraud or undue influence of any kind was used at the polling place. It is pertinent also that appellant did not raise this issue in his pleading—it was only after all the evidence was in that he made his motion to take the entire precinct from the results of the election. In a leading case on this matter, *Lehman v. Hill* (1953), 414 Ill. 173, the facts were quite different from those disclosed in the present case. In *Lehman* "the trial court found there were only approximately 60 persons entitled to receive assistance at the polls and disclosed by the permanent registration records yet the unquestioned evidence reveals that hundreds of voters actually were given assistance

by one of two persons, either Mayor Terry or Marcelus West, the latter a person not entitled to assist, being neither a judge or clerk of election. * * * hundreds of blank affidavits for assistance were included in the election supplies taken to the home of William Terry the night preceding the election. These disappeared and no satisfactory explanation was made or advanced and no effort was made to supply them after the disappearance became apparent. The lower court properly held this course to be a fraud and unlawful misconduct to the extent that the freedom and equality of the election in this precinct were destroyed and that the poll could not be purged of such unlawful votes, that it was impossible to determine the legal votes cast and as a result the entire poll was rejected."

■■ There is no evidence of any such machinations in the instant case and we have no hesitancy in holding that the voters in Golconda Poll 2 should not be disenfranchised.

One controlling issue remains to be discussed—was it proper for the trial court to use party affiliation as a method of determining how to deduct illegal votes and were there any irregularities in the admission of evidence to establish affiliation. A line of Illinois Supreme Court cases has established the rule that, in the absence of better evidence, party affiliation is the best evidence for determining how an illegal vote might have been cast. Before examining the appellant's argument that this rule should no longer hold, let us examine the cases.

The earliest case to announce the rule was *Sorenson v. Sorenson* (1901), 189 Ill. 179, 183, in which the court quoted with approval the following statement from 10 American and English Encyclopedia of Law, page 838 (2nd ed.): "Circumstantial evidence, such as party affiliation * * * is always admitted to show how a person voted, and is generally sufficient to prove the character of the vote." In *Rexroth v. Schein* (1903), 206 Ill. 80, 97, a case involving a contest for the treasurer of Monroe County in the 1902 election, the court said: "Circumstantial evidence may be resorted to in order to purge the ballot of illegal votes. The party affiliations of the voter have been held uniformly sufficient to raise the presumption that he cast his ballot for the nominees of the political party of which he was a member, and this proposition, in the absence of any countervailing proof or circumstances, is, it seems, to be accepted in determining for whom the voter cast his ballot."

In *Choisser v. York* (1904), 211 Ill. 56, 60-61, which involved a contest regarding the election of the superintendent of schools for Saline County, the court apportioned 9 of 15 illegal votes according to party affiliation. There was no evidence of party affiliation regarding six votes and no other evidence to determine how the parties might have voted

so they were apportioned three and three. With regard to these determinations the court said: "These questions were determined upon conflicting evidence heard in open court, and the court having seen and heard the witnesses, this court will not disturb the finding of the trial court unless its finding is manifestly wrong, which we are unable to demonstrate, from the evidence, to be true in the case at bar."

In *Widmayer v. Davis* (1907), 231 Ill. 42, the court quoted *Sorenson* and *Rexroth* with approval. This case, which involved a contest for Mayor of Jacksonville, illustrates the difficulty of making a proper determination about illegal votes. In *Widmayer* two witnesses testified under oath that they voted for the appellee. The trial court was upheld in an opposite finding, the court stating: "It cannot be denied that there was evidence tending to support the court's findings that Taylor, McKenny and Arenz voted for appellant, notwithstanding Taylor and McKenny swore they voted for appellee * * *." (231 Ill. at 52.) Furthermore, the court in *Widmayer* stated: "In addition to what appears upon the record, the trial court saw the witnesses and heard them testify. In such case the error in the finding of facts must be clear and palpable to justify a reversal." (231 Ill. at 52.) In *McCreery v. Burnsmier* (1920), 293 Ill. 43, the court approved the rule that how a voter votes may be established by circumstantial evidence. In *Talbott v. Thompson* (1932), 350 Ill. 86, 96, a case involving a contest concerning the election of the county clerk of Jefferson County in 1930, the court said: "Proof of the party affiliation of a voter raises a presumption that he cast his ballot for the nominee of his political party, and, in the absence of countervailing proof or circumstances, is accepted as determining for whom the ballot of such voter was cast." In this case the court cited *Rexroth, Sorenson,* and *Widmayer* with approval.

Though *Talbott* appears to be the most recent Illinois case dealing directly with this matter, we find that as recently as 1968 the New Jersey Superior Court followed this rule. In *Application of Murphy* (1968), 101 N.J. Super. 163, 170, 243 A.2d 832, 835-836, the court said: " '[c]ircumstantial evidence is admissable to prove for whom illegal votes were cast at an election * * * among the circumstances that may be considered are * * * party affiliations of the voter * * *.' "

We do not find, as appellant alleges, that evidence of party affiliation standing alone is insufficient to determine how a vote should be counted. In *Rexroth, Choisser,* and *Talbott,* the latter the most recent case, party affiliation was enough.

In our opinion appellant raises a more fundamental point when he urges that the rule established in these Illinois cases is outmoded due to the change in voter attitudes and the willingness of voters to cross over

720

and split their tickets. We have given this careful thought. Though it may be demonstrated that there is today less allegiance to party lines and more crossover voting than in the past, we feel that in the absence of better evidence party affiliation is still the best evidence for dividing the votes to be eliminated.

Simply saying that there are more split tickets today than formerly is hardly an argument for departing from the party affiliation test. There have always been split tickets. The number varies with elections and with candidates and by geographical areas as well as with the times. That there must have been many crossovers when the candidate for a "minority" party in an area receives a large vote is only one presumption. There are others. The larger vote could have been the result of greater party interest in a particular candidate and in party activity, thus getting out a larger proportional vote than the other party. Also, people may be more willing to change their party affiliations and some increased vote may be accounted for by those who, after belonging to one party for a lifetime, changed their party affiliation at the preceding primary election.

We recognize that there are weaknesses in the points which have been advanced, but we also recognize that the two-party system is an integral part of our political life, recognized not only in the manner in which candidates are presented but in our election laws themselves and in countless facets of our economic and social life. Asking illegal voters to disclose how they voted is hardly the answer—even if it could be done —since many of those who vote illegally would have no compunction about testifying that they voted for the opposite party. Throwing out all the votes in a voting precinct is not fair either to the legal voters or the candidates themselves and should be avoided if at all possible.

In the instant case we feel that the trial court took the best course available and, as disclosed by the record, did a painstaking job of examining witnesses to determine their party affiliation. We have examined the objections to testimony made by the appellant and are unable to say that the trial court committed any reversible error in admitting and excluding testimony. Consequently, the judgment of the trial court of Pope County is affirmed.

Judgment affirmed.

G. MORAN, P. J., and EBERSPACHER, J., concur.