PETER P. WHITE, APPELLEE, v. CHARLES H. SLAMA, APPELLANT.

FILED APRIL 8, 1911.  No. 16,786.

1. Elections: ELECTORS: RESIDENCE. If a man whose family resides in a foreign country or in a sister state comes into Nebraska temporarily for the purpose of working upon a railway, and while engaged in that vocation boards in a box car which is moved from station to station according to the directions of his superintendent, and as his work progresses, and immediately after the work is completed departs from the community, and while there performs no act other than to vote, nor makes any statement tending to prove an intention to acquire a residence in this state, he is not a resident within the meaning of section 1, art. VII of the constitution, nor an elector, notwithstanding the car in which he boards may have remained on a side-track in a voting precinct during the greater part of four months next preceding the election.

2. ———: ILLEGAL VOTES: CIRCUMSTANTIAL EVIDENCE. Circumstantial evidence is competent to prove which candidate received the benefit of illegal votes cast at an election.

8

3. ———: MARKED BALLOTS. A ballot should not be treated as void solely because it is marked in a peculiar manner; but, if the voter's intention can be ascertained from an inspection of the ballot, it should be counted in accordance with that intent.

4. ———: ———: PRESUMPTIONS. Ordinarily, in the absence of extrinsic evidence, the court will not presume that an irregularly marked ballot was thus prepared for the purpose of identifying the elector.

5. ———: ———. A ballot marked solely with a line or combination of lines wholly within a party circle should be counted for the candidates of that party, if there is no evidence that the lines were traced for the purpose of identifying the ballot.

6. ———: ———. A ballot marked with a well-defined cross within a party circle should not be rejected because of marks without that circle which extend into another party circle, where it appears from all of the lines that the elector intended the cross to evidence his vote.

7. ———: REJECTED BALLOTS. Where no more ballots are cast than the number of electors voting, and upon a recount one of those ballots is found in an envelope marked by the election board "rejected," and transmitted under their seal as part of their record to the county clerk, but neither the ballot nor the envelope is marked "spoiled" or "unused," and it appears probable from the testimony that the ballot was thus segregated from the other ballots by mistake, it should be counted, if fair on its face and not impeached by any fact or circumstance appearing in the evidence.

APPEAL from the district court for Saunders county: HOWARD KENNEDY, JUDGE. *Affirmed.*

*C. B. Peterson, B. E. Hendricks* and *Simpson & Good,* for appellant.

*E. P. Smith, J. H. Barry* and *H. Gilkeson, contra.*

ROOT, J.

This is an appeal from an order of ouster entered in the district court in proceedings instituted to contest the incumbent's title to the office of county judge of Saunders county. The district court found that White, the con-

testant, received 2,029 and Slama, the incumbent and contestee, 2,009 legal votes. The contestee argues that 36 votes cast for him were not counted and 9 too many votes were counted for the contestant.

We will first consider the alleged illegal votes which the court deducted from the incumbent's vote as canvassed and returned from Union precinct. The proof shows that in April, 1909, 25 Italian laborers came from Chicago to Ashland, in Saunders county, and during the spring and summer worked upon the railway between Ashland, Nebraska, and Sioux City, Iowa. During the warm weather these men cooked their meals and ate and slept out of doors; in cold or stormy weather they boarded and slept in five box cars, which were moved from station to station according to the order of their foreman. None of these men were within the state prior to April, 1909; some of them were married, but, so far as we are advised, their families were in Italy or in Chicago. Six of the men testified in this case, and it unequivocally appears that they are not and never have been citizens or residents of Nebraska, and that at least four of them have not declared their intention to become citizens of the United States. The box cars just referred to were switched upon the side-track at Yutan, in Union precinct, about the 17th of June, 1909, and there remained most of the time intermediate that date and October 29, upon which day the cars and the men were transferred to Fremont, in Dodge county, where they remained until the evening of November 1, at which time they were brought back to Yutan.

In the forenoon of November 2, election day, the Italians worked upon the railway grade, destroyed garbage that had accumulated in the neighborhood of the cars during the preceding weeks, and burned discarded railway ties. The preceding evening a Mr. Schulze, a saloon-keeper who affiliates with the republican party, stored two kegs of beer in a local merchant's ice chest for the use of these men; in the forenoon of November 2

Tony Caliendo, interpreter and time-keeper for the Italian workmen, and Mr. McDermot, their boss, who also affiliates with the republican party, conferred with Schulze. At this meeting Caliendo was told to take sample ballots, which were furnished him by Schulze, and instruct the Italians to vote by making a cross in the second party circle, which would, if received by the election board, cast a vote for all of the republican nominees. Caliendo took the ballots, interviewed all of the Italians at the boarding cars, gave every man a sample ballot containing a cross in the republican party circle, and told him how to vote. Between 12 and 1 o'clock the 25 Italians, including Caliendo, in company with McDermot, went in a body to the polls and voted while the democratic judge of election was absent for dinner. In the afternoon of that day the Italians consumed the beer provided by Schulze for their benefit, engaged in various amusements, and about 6:30 o'clock the following morning departed from the county, to which none of them, with the exception of Caliendo, have since voluntarily returned.

About the 1st of January, 1910, seven of these men were arrested for violating the election laws, and subsequently six of the prisoners testified for the contestant. Caliendo stated the facts in substance as we have detailed them, and said that he voted a ticket marked in the second circle; the other five Italian workmen testified in substance that they were instructed how to vote by Caliendo, and were given sample ballots marked in the second party circle, and that they voted an official ballot marked in that manner. One Italian under arrest was in Wahoo, the county seat of Saunders county, at the time of the trial, but was not called as a witness; the remainder of the 25 laborers had dispersed to points unknown to the contestant. The proof further shows beyond question that one of the Italians signed his name upon the back of the official ballot received and cast by him. This ballot is in evidence and bears a cross mark in the republican party circle. The contestant received but 39 votes in Union

precinct; 38 legal voters were called as witnesses, 29 of whom testified to having voted for White, but 9 claimed privilege and refused to state for whom they voted. Two hundred persons voted in Union precinct; the incumbent received ·154 votes, which, added to the 29 votes shown to have been cast for the contestant, leaves 17 votes unaccounted for. Upon the foregoing state of facts, the contestee contends that there is not sufficient proof that the Italians not interrogated as witnesses were not lawful electors of Saunders county, nor that all of them voted for him.

Whether an individual asserting the right to vote has established a residence within the meaning of section 1, art. VII of the constitution, is a judicial question. *Berry v. Wilcox,* 44 Neb. 82. But there is no absolute criterion by which to determine that fact. In *Berry v. Wilcox, supra,* it is said: "One's residence is where he has his established home, the place where he is habitually present, and to which, when he depart·, he intends to return. The fact that he may at a future time intend to remove will not necessarily defeat his residence before he actually does remove." In the case at bar these laborers had no boarding place other than the box cars, but they could have entertained no thought that Yutan, more than Ashland, Fremont or any other station upon the line of railway, was the point to which they expected to return when, in obedience to orders, they shifted from one locality to another upon the line of the railway, nor did they have any control over the movements of these cars; all of their tools and personal effects were removed with them October 29, when they rode to Fremont, and if their foreman had not, in obedience to directions from his superior, ordered the cars returned to Yutan, these men would not have returned to Union precinct.

We are unable to discover a single element, other than the bodily presence of these men in Union precinct on the day of election and their age, tending to establish their qualifications to vote at the election in question. On the

other hand, we think the established facts and the deductions which a court should draw from other facts appearing in the evidence not only justify, but imperatively require, a finding that they were not qualified electors. *People v. Teague,* 106 N. Car. 576; *Howard v. Skinner,* 87 Md. 556, 40 L. R. A. 753; *Sorenson v Sorenson,* 189 Ill. 179. McDermot, the foreman of these men, was unmarried and resided in Fremont; he also voted at the election. The evidence discloses that he registered in Fremont as a republican and affiliates with that party.

Having found that the votes were illegal, the next inquiry is whether the evidence will justify a finding that they were cast for Judge Slama. The voter is in the best position to know for whom he voted, but circumstantial evidence is competent to prove that fact, and where the facts and circumstances from which the finding is made are clearly established, and the inference is the only one which can fairly and reasonably be deduced therefrom, the court should not hesitate to act upon circumstantial evidence and therefrom find the ultimate fact. *Western Travelers Accident Ass'n v. Holbrook,* 65 Neb. 469. The testimony of Caliendo and of the other Italian witnesses is uncontradicted. So, also, is the testimony of the other witnesses concerning the facts connected with the voting of these men. McDermont is silent; Schulze does not appear; the local republican committeeman, who was present when these men voted, does not testify; and not one of the many suspicious circumstances appearing in the evidence are in any manner explained by the contestee. Some of these circumstances, if segregated from the others or skilfully arranged in groups, may seem inconclusive, but when weighed separately and compared as a whole, giving to each due weight, in combination they constitute convincing proof. In this connection we quote the language of Mr. Justice Clifford, reported in *The Slavers,* 2 Wall. (U. S.) 383, 401: "Circumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by

moral coincidences, be sufficient to constitute conclusive proof." And so it seems to us an application of the rule to the facts in the case at bar permits but one conclusion, and that is that these illegal votes were cast for Judge Slama.

In considering the argument that some of these ballots may have been cast for the contestant, and that there is no proof that the Italians voted straight ballots, it may be said that these men did not vote for candidates or for individuals; they had no comprehension of the elective franchise, but were following orders to put a cross in a definitely described circle. If that act, in connection with depositing the ballots in the ballot box, counted for Judge Slama, well and good; if for the contestant, Mr. White, they would have been in no manner disappointed or disturbed. We entertain no doubt that the mark was inscribed in the second circle upon every one of the 25 ballots cast by the Italian laborers. *Sorenson v. Sorenson, supra; Rexroth v. Schein,* 206 Ill. 80; *Widmayer v. Davis,* 231 Ill. 42; *People v. Teague, supra; Black v. Pate,* 130 Ala. 514. The fact that one Italian within the jurisdiction of the court was not called as a witness is an exculpatory circumstance, but it does not destroy the probative value of all the other undisputed facts and circumstances appearing in the record with respect to the issue under consideration. There is no proof in the record that Judge Slama was responsible for the conduct of these Italian laborers, and counsel for the contestant, at the bar, disclaimed any such contention, but for the purposes of this case it is immaterial whether party organization or misguided personal zeal inspired this plain violation of the law. No court should permit a candidate to hold an office by virtue of such a fraud. While the evidence is not so strong that McDermot voted the republican ticket, we think it is *prima facie* sufficient. Notwithstanding what has been said, if the contestee is correct that he should have credit for 16 votes not counted by the court and that 9 votes counted for the contestant

should be deducted, the judgment of the district court should be reversed.

The ballot marked exhibit "N" contended for by the contestee should not be counted for him; there is no mark in any party circle upon this ballot, but a cross appears in the square opposite the contestant's name, and a cross was marked in the square opposite the blank line next below Judge Slama's name. If, as the contestee contends, the cross last referred to should be considered as if it were marked in the square opposite his name, a vote was cast for both the contestant and the contestee, and the ballot could not be counted for either. With this ballot eliminated, there remain 15 rejected ballots contended for by the contestee.

Among the nine ballots alleged to have been erroneously counted for the contestant are exhibits 4, D, F, and L. Exhibit 4 is marked solely with a horizontal line in the democratic party circle. Upon exhibit D appears a cross inclosed in an acute angle within the democratic party circle, and no other mark. Upon exhibit F lines were drawn through the names of both candidates, for county superintendent of public instruction and through the names of both candidates for assessor. The name "John Nelson" was written upon the ballot as a candidate for county treasurer, and a cross was marked opposite his name. A cross was also marked in the square opposite the contestant's name. Exhibit L was marked by several crosses within the democratic party circle. The marks upon all of these ballots are within a party circle. Section 146, ch. 26, Comp. St. 1909, among other things, provides that a cross in a party circle casts a vote for every candidate nominated by that party. Section 151, ch. 26, *supra*, also provides that, "when a ballot is sufficiently plain to gather therefrom a part of the voter's intention, then it shall be the duty of the judges of election to count such part." This court has ever construed the Australian ballot law with great liberality, to the end that the voter's intent may be ascertained and given effect.

*State v. Russell,* 34 Neb. 116; *Spurgin v. Thompson,* 37 Neb. 39; *Bingham v. Broadwell,* 73 Neb. 605; *Griffith v. Bonawitz,* 73 Neb. 622. It seems plain to us that the electors in marking and casting these ballots intended to vote for Mr. White. The contestant, however, argues that exhibits D, F, and L, and exhibit 55, which will be later referred to, are so marked as to permit the identification of the electors who cast the ballots, and therefore should be rejected. No evidence of extrinsic facts was received or offered to suggest why the electors did not content themselves with marking a simple cross, instead of tracing the marks we find upon the ballots, nor do we know why those marks were made. If the evidence suggested that these ballots were thus marked for the purpose of advising a candidate or the public that any elector cast the particular ballot, we should exclude them. Unaided as we are by evidence other than the ballots, we shall not indulge in presumptions of wrongdoing, but shall count them for the candidate for whom they appear to have been cast. *Bingham v. Broadwell, supra; Griffith v. Bonawitz, supra; Gauvreau v. Van Patten,* 83 Neb. 64; *Bates v. Crumbaugh,* 114 Ky. 447; *Woodward v. Sarsons & Sadler,* 32 L. T. (Eng. 1875) 867, 872.

Upon exhibit 55 a cross was marked in the people's independent party circle; random lines were extended from outside to points within the prohibition · party circle; a blur appears without, but close to, both of these circles, and lines were drawn from the blur so as to converge near the center of the cross in the people's independent party circle. No other mark appears upon the face of the ballot, except lines drawn by the election board canceling the names of the candidates in road district No. 13. The elector evidently did not believe that he had spoiled the ballot, but thought the election board could ascertain his intention therefrom. The district court construed the ballot as a vote for the contestant. While it is not clear that the elector intended to vote the people's independent party ticket, we are of opinion that the evidence preponderates in favor of the finding of the district court.

Exhibit 42 is a ballot from Oak Creek precinct, and was counted in favor of the contestant; it was found among other ballots in an envelope marked "rejected ballots" and returned by the election board. Neither the ballot nor the envelope was marked "spoiled" or "unused," as the statute requires in case an elector returns a ballot which by mistake he improperly marks. The elector did not make a mark within any party circle, but made a cross opposite the names of various candidates, including the contestant. None of these marks are within the squares, but are upon the leader running from the candidate's name to his party's name. The cross extends more above than below White's leader, and we think evidences the elector's intention to vote for the contestant. There was no excess of ballots cast in that precinct, nor did the district court by counting this ballot increase the vote as canvassed and returned by the local board.

This disposes of six of the nine contested ballots counted by the district court in the contestant's favor, and if all of the remaining ballots contended for by the contestee should be counted in his favor and those objected to by him should be rejected, and we do not determine that they should or should not be thus disposed of, the contestant would still have a majority of two. The contestee did not assign in his motion for a new trial any error because the court did not count exhibit 20 in his favor. Possibly this fact might justify us in ignoring this ballot, and, if we did so, the contestant's undoubted majority would be increased to three. If we should count the ballots as they appear in the record, ignoring technical objections with respect to practice, the contestant, rather than the contestee, would profit thereby. But, since sufficient has been found to sustain the judgment of the district court, it is affirmed without further comment.

AFFIRMED.

REESE, C. J., not sitting.

LETTON, J., concurring.

I concur in the opinion, but I am convinced that at least ten ballots counted for the incumbent by the election board should not have been counted for him.

I also think that the judgment of the district court as to two other ballots counted for White by that court, but not considered or awarded to him by the opinion, was correct and should be followed.